# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| STEPHANIE E. ELLIOT, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) Cause No. 1:13-cv-90-WTL-DML |
| CAROLYN W. COLVIN, acting Commissioner of the Social Security Administration, | ) ) ) ) |
| Defendant. | ) ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Stephanie Elliot requests judicial review of the final decision of Defendant, Carolyn W. Colvin, Commissioner of the Social Security Administration ("Commissioner"), denying Ms. Elliot's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"). The Court rules as follows.

## I.    PROCEDURAL HISTORY

Stephanie Elliot protectively filed for SSI and DIB on June 3, 2010, alleging she became disabled on July 17, 2009, due to several medical conditions. Ms. Elliot's application was denied initially on September 20, 2010, and again upon reconsideration on December 20, 2010. Following the denial upon reconsideration, Ms. Elliot requested and received a hearing in front of an Administrative Law Judge ("ALJ"). A video hearing, during which Ms. Elliot was represented by counsel, was held in front of ALJ Angela Miranda on October 5, 2011. The ALJ issued her decision denying Ms. Elliot's claim on November 18, 2011. The Appeals Council

also denied Ms. Elliot's request for review on November 20, 2012. After the Appeals Council denied review of the ALJ's decision, Ms. Elliot filed this timely appeal.

## II. EVIDENCE OF RECORD

The evidence of record is aptly set forth in Ms. Elliot's brief. Specific facts are set forth in the discussion section below where relevant.

## III. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b).[1] At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-

---

[1] The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to DIB sections only.

month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id*., and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate her analysis of the evidence in her decision; while she "is not required to address every piece of evidence or testimony," she must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176.

## IV. <u>THE ALJ'S DECISION</u>

The ALJ determined at step one that Ms. Elliot had not engaged in substantial gainful activity since July 17, 2009, the alleged onset date. At steps two and three, the ALJ concluded that Ms. Elliot has the following severe impairments:

> mental impairments variously assessed as depression, major depressive disorder, dysthymic disorder, bereavement, anxiety, panic disorder, post traumatic stress disorder, and anxiety with some post traumatic symptoms; seizure disorder described as general seizure disorder, partial complex seizures with secondary generalization, and stress response; back disorders described as mild spondylosis, mild bulge at T5-6, and central and left protrusions multilevel in the thoracic

3

spine with mild curvature, and mild changes of spondylosis and osteophyte formation in the cervical spine status post partial corpectomy ac C5-6; and Hashimoto's thyroiditis status post thyroidectomy; and mild intermittent asthma with tobacco use disorder.

R. at 29-30. The ALJ, however, found that her impairments, singly or in combination, did not meet or medically equal a listed impairment. At step four, the ALJ determined that Ms. Elliot had the RFC to perform sedentary work with certain limitations. Given that RFC, the ALJ determined that she could not perform any of her past relevant work. Finally, at step five the ALJ determined that Ms. Elliot could perform a range of work that exists in the national economy, including a final assembler, lens inserter, and toy stuffer. Accordingly, the ALJ concluded that Ms. Elliot was not disabled as defined by the Act.

## V. DISCUSSION

In her brief in support of her Complaint, Ms. Elliot argues that the ALJ: 1) erred in assessing an RFC that is not supported by substantial evidence; 2) improperly dismissed her own testimony; and 3) erred at Step Five. Each of her arguments will be addressed, in turn, below.

### A. The ALJ's RFC Assessment

*1. Mental RFC*

Ms. Elliot first argues that the ALJ erred in her mental RFC assessment. The relevant portion of this assessment is as follow:

> [M]entally the claimant has the capacity to understand, remember, and carry out simple, routine tasks. The claimant has the capacity to appropriately interact with supervisors and has the capacity for occasional interaction with coworkers and the general public. The claimant has the capacity to identify and avoid normal work place hazards and to adapt to routine changes in the workplace. Occasional interaction with coworkers and the general public is defined as having the ability to work in the vicinity of other workers or the general public, but actual interaction for completion of job tasks is limited to 1/3 of the work day.

*Id.* at 33. With regard to this assessment, Ms. Elliot argues that the ALJ erred in rejecting three separate pieces of medical evidence that contradict the above limitations

First, Ms. Elliot argues that the ALJ erred in giving little weight to two opinions given by Gayle Humes, a licensed mental health counselor[2]—one in July 2010 and the second in October 2011. In July 2010, Ms. Humes noted that Ms. Elliot was not able to attend to a simple work routine on a consistent basis because "she fears moving out of her home not only because of her depression and agoraphobia but also because of the frequency of her seizures." *Id.* at 783. Similarly, in October 2011, Ms. Humes noted that Ms. Elliot was "unable to meet competitive standards" and/or had "no useful ability to function" in a number of areas, including her ability to "maintain attention for two hour segments"; "maintain regular attendance"; "work in coordination with or proximity to others without being unduly distracted"; "perform at a consistent pace without an unreasonable number and length of rest periods"; and "accept instructions and respond appropriately to criticism from supervisors." *See id.* at 1116.

Ms. Elliot concedes that Ms. Humes is not an "acceptable medical source" as defined in 20 C.F.R. § 404.1513; rather, as a counselor, Ms. Humes is considered an "other source." Social Security Ruling ("SSR") 06-03p states that information from these other sources "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function" and "should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Nevertheless, Ms. Elliot argues that the ALJ incorrectly attributed the July 2010 opinion solely to Ms. Humes when it was also counter-signed by Dr. Heather Downhour, a psychologist. *See* dkt. no. 14-12 at 784. She argues

---

[2] Ms. Elliot identifies Ms. Humes as a licensed clinical social worker ("LCSW") in her brief. *See* Pl.'s Brief at 9. However, it appears to the Court that Ms. Humes is actually a licensed mental health counselor ("LMHC") based on her signature. *See, e.g.*, R. at 746, 1124. Regardless, Ms. Humes is not an "acceptable medical source."

5

that this was an error because as a psychologist, Dr. Downhour was an "acceptable medical source" and therefore, her opinion was entitled to controlling weight. The Court disagrees. The evaluation was conducted by Ms. Humes and there is no evidence that Dr. Downhour saw Ms. Elliot or that Ms. Humes consulted with Dr. Downhour in making her assessment. It appears to the Court that the form simply had to be countersigned by either a physician or a psychologist, and therefore, Dr. Downhour counter-signed the document. Despite the counter-signature, the opinion is from Ms. Humes. As such, the ALJ was not required to give the opinion any added or controlling weight. *See* SSR 06-03p (noting that the distinction between "acceptable medical sources" and "other sources" is important because "only 'acceptable medical sources' can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.").

In giving "little weight" to Ms. Humes' opinions, the ALJ noted that "the claimant had GAF [Global Assessment of Functioning] scores reflecting only moderate limitations[3] and that, although her depression increased and improved over time, she suffered no psychosis and continued to be able to manage her activities of daily living." R. at 39. As noted above, the ALJ was not required to give controlling weight to Ms. Humes' opinions; however, Ms. Humes gave

---

[3] Ms. Elliot also takes issue with the ALJ's failure to mention that she had a GAF score of 29 in May 2011 when she was admitted to the hospital. *See* R. at 980. While the ALJ did not specifically mention this score, the ALJ did note that Ms. Elliot

> reported to the emergency room after taking six additional Vistaril with the intent to harm herself. She was transferred to Community North Hospital after endorsing suicidal ideations. She was admitted to the hospital following her overdose. . . . She stayed in the hospital for a week during which time she received individual and group therapy. . . . She was discharged in an improved condition with a fair prognosis depending on her compliance with treatment.

*Id*. at 38. The Court, therefore, sees no error in the ALJ's failure to specifically note that at this time, Ms. Elliot was given a GAF score of 29.

opinions on the severity of Ms. Elliot's mental impairments and their functional effects that the ALJ was required to consider.

It is unclear to the Court why the ALJ gave Ms. Elliot's lack of psychosis as a reason for discounting Ms. Humes' opinions. While the ALJ is correct that she does not suffer from psychosis, she failed to explain why this resulted in assigning little weight to Ms. Humes' opinions. It does not appear from the Court's review of the record that Ms. Humes ever reported that Ms. Elliot suffered from psychosis. Further, as discussed more fully below, the ALJ's discussion of Ms. Elliot's daily activities differs greatly from what is actually reflected in the record; Ms. Humes' descriptions of Ms. Elliot's daily activities are consistent with what the record actually reflects. *See id.* at 783 (describing Ms. Elliot's current daily activities as follow: "Get up in a.m. take meds. Feed Kaitlin breakfast, make sure she is dressed, brush my hair, lie on couch . . . watch TV . . . fix supper . . . take meds, lie back down, watch movie and get ready for bed – can't leave house"). Finally, the ALJ is correct that GAF scores of 51-60 indicate moderate symptoms; but these include flat affect, circumstantial speech, occasional panic attacks, few friends, and conflicts with co-workers. These symptoms are consistent with what Ms. Humes reported in her opinions. *See id.* at 1115 (noting that Ms. Elliot's symptoms included "blunt, flat, or inappropriate affect"; "emotional withdrawal or isolation"; and "severe panic attacks"). In all, the Court agrees with Ms. Elliot that the ALJ's rationale for assigning little weight to Ms. Humes' opinions is erroneous and not supported by the record.

Ms. Elliot also argues that the ALJ erred in her decision to assign little weight to Dr. Alfred Borrow, who conducted a psychological evaluation of Ms. Elliot on July 29, 2010. Dr. Borrow concluded that Ms. Elliot

> presents symptoms consistent with what appears to be a recurrent major depressive disorder which is severe and without psychotic features. . . .

7

> Concentration appears to be significantly affected, as does her focus and ability to process information quickly. . . . Computational ability appears to be significantly affected, while formal judgment appears to be relatively adequate, along with comprehension. . . . it would appear that Ms. Elliot may have some difficulty managing her funds independently and, as a result, be in need of supervision in this area.

*Id*. at 806. The ALJ gave this opinion "little weight in that he only saw the claimant during a one-time consultation and appeared to give significant weight to the claimant's reported symptoms over the objective medical findings." *Id*. at 40. While the ALJ assigned little weight to Dr. Borrow's opinion because he only saw Ms. Elliot one time, she also assigned little weight to Ms. Humes' opinions, despite the fact that Ms. Elliot saw Ms. Humes on a fairly regular basis—biweekly—since September 2009. Further, while Dr. Borrow's conclusions contain some subjective reports given by Ms. Elliot, the relevant portion cited above is not based on Ms. Elliot's subjective reports, but rather, based on Dr. Borrow's examination and own observations. Once again, the Court finds the ALJ's reasoning for assigning little weight to this opinion erroneous.

Finally, Ms. Elliot argues that the ALJ erred in rejecting Dr. Joseph A. Pressner's conclusion that she was moderately limited in her "ability to accept instructions and respond appropriately to criticism from supervisors." *Id*. at 810. The ALJ disagreed with this, and in her RFC assessment, noted that Ms. Elliot "has the capacity to appropriately interact with supervisors[.]" *Id*. at 33. As explained more fully below, the record supports Dr. Pressner's findings that Ms. Elliot experiences difficulties interacting with supervisors, especially when receiving criticism. On remand, the ALJ should reconsider her mental RFC assessment with regard to Ms. Elliot's ability to interact with supervisors in light of Dr. Pressner's finding, which is supported by other evidence in the record.

In all, the Court agrees that the ALJ in this instance did not provide sufficient justification for assigning little weight to these opinions. The ALJ fully or partially rejected every opinion in the record and as a result crafted a mental RFC assessment that is not supported by the record. This requires remand.

### 2. *Physical RFC*

Ms. Elliot argues that her physical RFC is not supported by substantial evidence in the record because the ALJ failed to assess any limitations that account for her seizures. With regard to her seizure disorder, the ALJ noted:

> While I note that the record reflects that the claimant has a seizure disorder, the claimant's seizures do not appear to occur with a disabling frequency. While the claimant testified at hearing that she experiences 5-10 seizures a month, she also noted that she had never experienced any seizures in the past while at work. She also testified that she has gone as long as three months without experiencing a seizure and had her last seizure in July 2011. Therefore, while the claimant has a severe seizure impairment, the record shows that the claimant's symptoms are generally well controlled when she is properly taking her medications.

*Id*. at 35-36. In his physical RFC assessment conducted in August 2010, Dr. J. Sands, a state agency doctor, noted that Ms. Elliot should "avoid all exposure" to "hazards (machinery, heights, etc.)." *Id*. at 831. The ALJ, however, did not mention that notation and gave no restrictions for Ms. Elliot's seizure disorder in her RFC assessment or in the hypothetical given to the VE.

The Commissioner argues that the ALJ provided sufficient justification for why Ms. Elliot's seizure disorder is not a disabling as she alleges. She states that while the ALJ found that her seizure disorder was well controlled, "the ALJ did not state that Plaintiff experienced *no* seizures when taking her medications." Response at 22. While true, this is precisely the problem. The record supports the fact that Ms. Elliot has a seizure disorder. There is a risk that even if Ms. Elliot takes her mediations as prescribed she will have a seizure—which is precisely

why Dr. Sands noted that Ms. Elliot should avoid all exposure to hazards. Stating that Ms. Elliot's seizures are "well controlled" does not mean that the risk of having one is zero.

Further, while the Commissioner argues that "[n]othing in the *Dictionary of Occupational Titles* (DOT) descriptions for these jobs [described by the VE] indicate that the tools and machines used are necessarily hazardous," Response at 23, this is not for the Commissioner to determine. Rather, a specific finding needs to be made by a VE regarding whether any of the three jobs identified would require Ms. Elliot to be exposed to any hazards. *See Young v. Barnhart*, 362 F.3d 995, 1005 (7th Cir. 2004) ("When the hypothetical question is fundamentally flawed because it . . . does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand."). On remand, the ALJ should include the limitation of avoiding all exposure to hazards in her hypothetical given to the VE.

### B. Ms. Elliot's Testimony

Ms. Elliot next argues that the ALJ improperly dismissed her own testimony in discrediting her credibility. Ms. Elliot first takes issue with the ALJ's consideration of her daily activities. The ALJ noted that

> [t]he claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Despite her impairments, the claimant has engaged in a somewhat normal level of daily activity and interaction. The claimant admitted activities of daily living including taking care of her seven-year-old daughter, preparing meals on a daily basis, doing household chores, driving a car, going to the grocery store, managing money, talking on the telephone, and helping her daughter with homework. Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment. I find the claimant's ability to participate in such activities diminishes the credibility of the claimant's allegations of functional limitations.

R. at 38.  The Court agrees with Ms. Elliot that this description is inaccurate and unsupported by the record.  For instance, Ms. Elliot testified that she lives with her grandmother and that her sister picks up her daughter when she is too depressed to leave the house; in other words, she has help in caring for her daughter. *See id*. at 69-71.  While the ALJ noted that Ms. Elliot prepares meals on a daily basis, these meals consist only of frozen dinners as opposed to the full-course meals she used to be able to prepare. *Id*. at 217.  Ms. Elliot does go grocery shopping, but she only goes once a month and stated, "I hurry up and get in there and get what I need and get out." *Id* at 72.  She does perform various household chores when she feels like she is able, which is only two or three times a week. *Id*. at 70.  With regard to managing her money, Ms. Elliot can pay her bills and count change, but she cannot handle a savings account, use a checkbook, or use a money order. *Id*. at 218.  Finally, while the ALJ noted that Ms. Elliot uses the telephone for communication purposes, this is because she experiences panic attacks when she is around other people. *Id*. at 219.

The ALJ failed to give a thorough and accurate description of Ms. Elliot's testimony and functional report, which is actually much more restrictive than what is contained in the ALJ's decision.  Most glaring is the ALJ's omission of Ms. Elliot's own testimony that there are times when she is too depressed to even leave the house. *Id*. at 71; *see also id*. at 217 ("[T]here are times I don't even feel like getting out of bed.").  Certainly, on those days, which were still occurring at the time of the hearing, Ms. Elliot does not perform any of the above activities.  In sum, the Court believes that the ALJ misconstrued the evidence in the record—it does not reflect the level of daily activity that the ALJ included in her opinion.  On remand, the ALJ shall more carefully examine Ms. Elliot's daily activities, paying careful attention to the limitations to which she testified and described in her functional report.

11

Ms. Elliot next argues that the ALJ erred in failing to consider that her gaps in treatment, missed therapy appointments and, at times, her failure to take her prescription medications are a result of her psychological symptoms. The ALJ noted that

> the record reveals that the claimant cancelled or failed to show up for therapy sessions on a number of occasions. Furthermore, as detailed above, the record reflects significant gaps in the claimant's history of treatment and significant periods of time since the alleged onset date during which the claimant has not taken any medications for her allegedly disabling symptoms.

*Id.* at 38. The Commissioner's response hits the problem on the head—"[t]he record cited by the ALJ indicates no such excuse for Plaintiff's non-compliance." Response at 25. In other words, the ALJ ignored those parts of the record that suggested Ms. Elliot's missed appointments and gaps in treatment resulted from her psychological symptoms. For instance, Ms. Humes noted in July 2010, that Ms. Elliot "misses some appts because she cannot leave the house. Interaction is difficult for her." R. at 784.[4] While the record does not always contain this notation in conjunction with the documentation of missed appointments, *see, e.g.*, *id.* at 1120, the ALJ was required to consider the possibility that Ms. Elliot's symptoms caused some of these inconsistencies. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.").

---

[4] The Commissioner responds to this statement by noting that Ms. Humes' notation "did not specifically mention that [her missed appointments were] due to depression or anxiety." R. at 25. It is unclear to the Court what else besides her depression and/or anxiety would cause Ms. Elliot to not leave the house, as the record is replete with documentation that her depression, anxiety, and panic attacks prevent her from leaving the house and interacting with others.

12

Further, the Commissioner's argument that "[t]he ALJ's notation regarding non-compliance is connected with her finding that Plaintiff's symptoms improved when she attended therapy and took her medications," Response at 25, misses the mark. Ms. Elliot does not dispute that she functions better when she receives regular treatment and/or takes her medication as instructed; she argues that the ALJ inappropriately discounted her credibility because of her inconsistent treatment without first examining if there were "good reasons" for doing so. *See* SSR 96-7p ("The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner."). This requires remand.

Finally, Ms. Elliot argues that the ALJ rejected her own testimony regarding her past employment. With regard to her employment, the ALJ noted:

> Records from her most recent employer in July 2009 show that the claimant had good attendance. There was no record of an inability to perform tasks or inability to concentrate. While working there the claimant did not need special consideration or frequent breaks. According to her former employer, the claimant had no problem understanding and carrying out simple instructions and had above average performance evaluations. Additionally, she had no problems working in close proximity to others or getting along with her co-workers and supervisors, although she did not like when her supervisors assigned her additional duties. By all indications, the claimant was performing adequately and only walked off the job in July 2009 after being reprimanded by her supervisor. *This suggests that the claimant stopped working due to this incident rather than reasons related to her allegedly disabling impairments.*

R. at 38-39 (emphasis added). The ALJ's conclusion that Ms. Elliot stopped working for reasons other than her impairments is not fully supported by the record. Ms. Elliot testified that she would get panic attacks and become anxious and nervous when her supervisor would come close to her. *Id*. at 58. She also testified that when her supervisor criticized her in July 2009, she "got real upset and started crying and just walked out." *Id*. at 61. This testimony suggests that Ms.

13

Elliot experiences difficulties with supervisors, especially when she is receiving critical feedback. Moreover, Dr. Pressner and Ms. Humes made the same finding. *See id.* at 811, 1122. On remand, the ALJ should consider this testimony, which is supported by the record, and determine if this changes her mental RFC assessment with regard to how Ms. Elliot can interact with supervisors.

### C. The ALJ's Step Five Determination

Finally, Ms. Elliot argues that the ALJ erred at Step Five because she gave an incomplete hypothetical to the VE at the hearing. Specifically, she argues that the ALJ failed to account for her deficiencies in social functioning and concentration, persistence or pace. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2010) ("[F]or most cases, the ALJ should *refer expressly to limitations on concentration, persistence and pace in the hypothetical* in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do.") (emphasis added). The problem with Ms. Elliot's argument is that the ALJ found that she had moderate difficulties with concentration, persistence, and pace in evaluating whether she met the requirements of paragraph B at Step Three, not in assessing her RFC. *See* SSR 96-8p ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").[5] This is distinguishable from *O'Conner-Spinner*, in which "[t]he state examiner's RFC determination explicitly noted that there were at least moderate

---

[5] The ALJ also expressly noted this in her decision. *See* R. at 33 ("The limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.").

limitations here, and the ALJ agreed with that determination." *O'Connor-Spinner*, 627 F.3d at 620.

The ALJ posited, in part, this hypothetical to the VE: "The individual has the capacity to understand, remember, and carry out simple, routine tasks." R. at 77-78. This is consistent with Ms. Elliot's mental RFC that was conducted by Dr. Pressner in August 2010. Dr. Pressner noted that "[t]he evidence suggests that the clmt can understand, remember, and carry-out simple tasks." *Id*. at 811. While the ALJ gave little weight to his paragraph B findings, she did agree with this statement. The ALJ's hypothetical, therefore, was consistent with her findings regarding Ms. Elliot's concentration, persistence, and pace.

The Court notes, however, that given the findings above, Ms. Elliot's mental RFC will likely change on remand. Therefore, while the current RFC and hypothetical account for the limitations the ALJ found in Ms. Elliot's concentration, persistence, and pace, on remand if the ALJ crafts a more restrictive mental RFC, she may need to include specific limitations in concentration, persistence, and pace in the hypothetical given to the VE.

## VI. CONCLUSION

As set forth above, the ALJ in this case erred in assessing both a mental and physical RFC that is not supported by the record. Further, the ALJ's credibility determination of Ms. Elliot is unsupported by the record. The decision of the Commissioner is therefore **REVERSED AND REMANDED** for further proceedings consistent with this Entry.

SO ORDERED: 03/17/2014

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication

15